******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MARWAN CHANKAR
(AC 37782)

Alvord, Sheldon and Norcott, Js.

*Argued March 8—officially released May 16, 2017*

(Appeal from Superior Court, judicial district of New London, Jongbloed, J.)

*Jennifer B. Smith*, assigned counsel, for the appellant (defendant).

*David J. Smith*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Marwan Chankar, appeals from the judgment of conviction, rendered after a jury trial, of arson in the first degree in violation of General Statutes § 53a-111 (a) (2) and criminal mischief in the first degree in violation of General Statutes § 53a-115 (a) (1). The jury found the defendant not guilty of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a. On appeal, the defendant claims that (1) his fifth amendment and fourteenth amendment privilege against self-incrimination was violated when police officers conducted a custodial interrogation of him without advising him of his *Miranda* rights;[1] (2) there was insufficient evidence presented at trial to support his conviction of arson in the first degree; and (3) the prosecutor violated his right to a fair trial by committing certain improprieties during closing argument. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In the summer of 2011, the defendant frequently spent time smoking crack cocaine with Henry Wickham and Anthony Thomas, who resided in the same three-story multifamily house on Rockwell Street in Norwich.[2] Wickham resided in the sole third floor apartment, and Thomas resided in Apartment 2A, which was located on the second floor toward the back of the house and below Wickham's apartment. While "hanging out" together, the defendant and Wickham would smoke crack cocaine together. On or about July 7, 2011, the defendant helped Thomas move out of Apartment 2A. Because the defendant was homeless and nobody was living in Apartment 2A, the defendant began sleeping there.

On July 9, 2011, at approximately 8:30 p.m., Wickham confronted the defendant about breaking into his third floor apartment when he was not present.[3] Wickham told the defendant to leave the house, and the defendant did so after retrieving some personal items from Apartment 2A. The defendant was "very upset and angry and pissed off" about his argument with Wickham so he walked to a nearby package store to purchase some alcohol. The package store closed at 9 p.m. and was approximately a twenty-minute walk from Wickham's house. After having a couple of drinks, the defendant returned to Wickham's house. He took charcoal lighter fluid from Wickham's porch and started a fire in Apartment 2A.

At approximately 10 p.m., Darrell Wommack, who resided in Apartment 2B, smelled something burning. When he walked into his kitchen, he saw a fire glowing on the trees behind the house. Wommack then went to his porch and realized that Apartment 2A "was on fire

really bad." Wommack woke his roommate and told him to call the fire department. Wommack ran to Apartment 2A and began banging on the door to alert anyone inside to the fire. When nobody responded, Wommack pushed open the door and black smoke billowed out of the apartment, forcing him back into the hallway.

When Wommack fell back into the hallway, his roommate met him. Wommack told his roommate to leave the house and proceeded upstairs to warn Wickham about the fire. When Wickham did not answer the door, Wommack opened it and found Wickham asleep in his bed. Wommack woke Wickham, who initially appeared to be "starstruck," and the two men ran out of the house. Thereafter, members of the fire department arrived.[4]

Meanwhile, after leaving Wickham's house, the defendant saw an acquaintance, Samantha Fidrych, across the street. The defendant was unsure whether Fidrych saw him, so he called her from a nearby pay phone. During their conversation, the defendant told Fidrych that Wickham's house was on fire. Later, at about 11:30 p.m. or 12 a.m., the defendant called another friend, Laura Wallace, and told her that something had happened and he needed to speak to her. Wallace told the defendant to come to her house, and he arrived between 12 a.m. and 12:30 a.m. The defendant appeared worried and upset, and Wallace asked him what was wrong. The defendant told her about how Wickham had asked him to leave his house and how, after having a couple of drinks, he returned to the house and started a fire on the second floor. The defendant remarked that when he turned around as he was leaving, he was "really surprised [the fire] took off so fast because it just looked like daylight, it was so bright."

On July 26, 2011, police officers went to a methadone clinic that the defendant frequented to interview him about the fire. When the officers approached the defendant, he said, "I know why you're here." The officers asked why, and the defendant replied that they were there "about the fire on Rockwell Street," i.e., the location of Wickham's house. During their conversation, the defendant admitted to being at Wickham's house on July 9, 2011, to arguing with Wickham over crack cocaine, and to becoming "very upset and angry and pissed off" at Wickham as a result. He maintained, however, that after Wickham told him to leave the house, he went to a nearby package store to purchase some alcohol and then spent the rest of the night with Wallace.

The defendant also mentioned passing Fidrych about one hour after leaving Wickham's house and calling her to tell her about the fire at Wickham's house. When the officers asked the defendant how he knew there was a fire at that time,[5] he initially stated that he did not know but later claimed that Jonathon Bogue had told him about the fire.[6]

During the interview, the officers questioned the defendant about whether he ever cooked with Wickham on Wickham's charcoal grill on the third floor porch. The defendant admitted that he had, but he stated that he could not remember how they started the fire on the grill. The defendant also correctly listed all of the items stored on Wickham's porch, with the exception of the charcoal lighter fluid. When the officers asked the defendant whether "he was actually responsible for the fire, whether it be accidentally or on purpose," the defendant responded, "I can't admit to it. I just can't have it." Sometime thereafter, the defendant told Wallace that he had told the police that he was with her on the night of the fire and asked her to corroborate his story.

The defendant was charged by way of a substitute long form information with attempted murder, arson in the first degree, and criminal mischief in the first degree. The jury found the defendant guilty of arson in the first degree and criminal mischief in the first degree, and not guilty of attempted murder. The court sentenced the defendant to a total effective term of seventeen years of imprisonment followed by six years of special parole. This appeal followed.

I

We begin with the defendant's claim that the trial court violated his fifth and fourteenth amendment privilege against self-incrimination by denying his motion to suppress the statements that he made to the police officers during the July 26, 2011 interview. In particular, he argues that the court erred when it determined that he was not in custody at the time he was interviewed. We disagree.

The court found the following additional facts that are relevant to the defendant's claim. Officer Robert Smith and Sergeant Peter Camp of the Norwich Police Department were assigned to investigate the fire at Wickham's house.[7] They developed information that the defendant was responsible for the arson and that he regularly attended the methadone clinic in Norwich. On the morning of July 26, 2011, the officers went to the clinic to see if the defendant arrived. Camp was parked across the street near a cemetery and Smith was parked in the clinic parking lot.

When the officers observed the defendant arrive by bus and wait outside the clinic near a guardrail with another individual, they approached the defendant. The officers were dressed in plain clothes and, although armed, neither officer drew his weapon. The defendant told the other individual "words to the effect that he would catch up with him later." When the officers approached the defendant, he said, "I know why you're here . . . ." The officers asked why, and the defendant replied that they were there "about the fire on Rock-

well Street."

The officers asked the defendant if he would talk to them about the fire, and he said that he would, but he expressed his concern about being seen with the officers because he would be viewed as a "snitch." The officers asked the defendant if he would accompany them to the Norwich Police Department, but the defendant declined. The officers then suggested that they go to the cemetery across the street, and the defendant agreed. The officers returned to their respective vehicles and drove to the back of the cemetery where they looked around to make sure that they would not be interrupting any services. The officers waited for the defendant to walk to the location. During this time, the officers wondered whether the defendant would actually arrive. The defendant voluntarily walked to the location at the back of the cemetery.

When the defendant arrived at the cemetery, the officers asked if they could search his backpack for weapons, but the defendant said that he preferred that they not do so. The officers then asked if they could put his backpack in one of their cruisers for safety reasons while they spoke, and the defendant agreed to that request. Camp put the defendant's backpack in his cruiser. The officers asked the defendant questions about the fire. During this discussion, the officers told the defendant that "no matter what he told us, he was free to leave at any time . . . ."[8]

When the questioning became repetitive and the defendant expressed his concern about being late to meet his mother, the interview ended. The defendant mentioned that he wanted to call his mother, and Camp offered the defendant the use of his personal cell phone, which the defendant used to arrange for his mother to pick him up at the clinic.[9] The officers returned the defendant's backpack, and the defendant left.

This interaction lasted no more than thirty to forty-five minutes. At no time during this interview did the officers advise the defendant of his *Miranda* rights. Additionally, the officers never handcuffed, restrained, or threatened the defendant.

On September 5, 2014, the defendant filed a motion to suppress his statements, arguing that they were the product of a custodial interrogation during which he was not advised of his *Miranda* rights. On September 18 and October 8, 2014, suppression hearings were held. The court heard the testimony of the defendant, his mother, and Camp. On October 24, 2014, the court issued an oral ruling denying the defendant's motion. The court credited Camp's testimony. The court further found that the defendant was not in custody at the time of the interrogation and, therefore, concluded that he was not entitled to *Miranda* warnings.

"Under our well established standard of review in

connection with a motion to suppress, we will not disturb a trial court's finding of fact unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . .

"In order to establish that he was entitled to *Miranda* warnings, a defendant must show that he was in custody when he made the statements and that he made the statements in response to police questioning. . . . In assessing whether a person is in custody for purposes of *Miranda*, the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address. . . .

"In [*State* v. *Mangual*, 311 Conn. 182, 85 A.3d 627 (2014)], we set forth the following nonexclusive list of factors to be considered in determining whether a suspect was in custody for purposes of *Miranda*: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." (Citations omitted; internal quotation marks omitted.) *State* v. *Arias*, 322 Conn. 170, 176–77, 140 A.3d 200 (2016).

After applying the *Mangual* factors to the facts in this case, we conclude that a reasonable person in the defendant's position would not have believed that he was in police custody of the degree associated with a formal arrest. The entire exchange was informal in nature and short in duration, lasting no more than thirty to forty-five minutes. Although the location of the interview secluded the defendant from the public,[10] we note that it was the defendant who requested to speak in a more private location. The officers initially suggested speaking at the Norwich Police Department but, when the defendant declined, they suggested going across the street to the cemetery. The defendant agreed to be interviewed there. He then voluntarily walked over to the back of the cemetery by himself.

In addition, at no point during this exchange was the defendant handcuffed or otherwise physically

restrained. There were only two officers present for the questioning. The officers were dressed in plain clothes, and, although they were armed, they never drew their weapons. The officers told the defendant a couple of times that no matter what he said he was free to leave at any time.[11] Although the officers put the defendant's backpack in their cruiser during the interview, we do not believe that a reasonable person in the defendant's position would have believed in these circumstances that there was a restraint on his freedom of movement of the degree associated with a formal arrest. The officers explained to the defendant that the reason they wanted to put his backpack in one of their cruisers was for safety reasons, and they only made this request after the defendant expressed his preference that they not search it for weapons. The defendant also agreed to this request. We think that a reasonable person in this situation would have believed that if he decided to end the interview, as the officers told him he could do at any time, the officers would return his backpack.

Considering the totality of the circumstances, the court properly determined that the defendant was not in custody and, therefore, a *Miranda* warning was not required.

## II

The defendant next claims that his conviction of arson in the first degree must be reversed because "[t]he state failed to present sufficient evidence to establish beyond a reasonable doubt that [he] was the individual responsible for setting the fire." We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of

evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

We conclude that there was sufficient evidence for the jury to find that the defendant was responsible for the fire at Wickham's house. At the outset, we observe that Wallace testified that the defendant told her that he set the fire. On the basis of this testimony alone, the jury reasonably could have concluded that the defendant started the fire. See *State* v. *Victor C.*, 145 Conn. App. 54, 61, 75 A.3d 48 ("the jury may find a defendant guilty based solely on the testimony of one witness"), cert. denied, 310 Conn. 933, 78 A.3d 859 (2013). The defendant disagrees, arguing that Wallace's testimony was "suspect at best" and inconsistent with the fire investigators' testimony, but this argument misapplies our standard of review, which requires us to construe the evidence in the light most favorable to sustaining the verdict and to defer to the jury's credibility assessments. *State* v. *Crespo*, supra, 317 Conn. 16–17; *State* v. *Jason B.*, 111 Conn. App. 359, 363, 958 A.2d 1266 (2008), cert. denied, 290 Conn. 904, 962 A.2d 794 (2009). A jury may properly decide "what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Victor C.*, supra, 61.

Nonetheless, Wallace's testimony was not the only evidence that supported the defendant's conviction. In the weeks leading up to the fire, the defendant was frequently at Wickham's and Thomas' apartments. The defendant cooked with Wickham on several occasions on the charcoal grill on his porch, where Wickham stored charcoal lighter fluid. On the day of the fire, the defendant had an argument with Wickham, which left the defendant, by his own admission, "very upset and angry and pissed off." The defendant left Wickham's

house at about 8:30 p.m. He then purchased alcohol from a nearby package store, which closed at 9 p.m. Wommack realized that the house was on fire at approximately 10 p.m. The defendant arrived at Wallace's house between 12 a.m. and 12:30 a.m., but, prior to arriving, he called Fidrych and told her that Wickham's house was on fire. This call was placed from a location where the defendant would not have been able to see Wickham's house.

On the basis of this evidence, the jury reasonably could have concluded that the defendant had access to Apartment 2A and Wickham's charcoal lighter fluid, had a motive to start a fire beneath Wickham's apartment, had an opportunity to set the fire, and had personal knowledge about the fire shortly after it was started. The defendant advances several arguments as to why the evidence presented at trial and the inferences reasonably drawn therefrom are consistent with his innocence, but these arguments are inconsistent with our standard of review. After construing the evidence as we must, in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found the defendant guilty beyond a reasonable doubt.

## III

The defendant's final claim is that the prosecutor committed certain improprieties during his rebuttal argument and that the cumulative effect of such improprieties deprived him of a fair trial. We disagree that the prosecutor committed improprieties during rebuttal argument and, therefore, reject the defendant's claim.

The following additional facts are relevant to this claim. On July 10, 2011, while the fire was being extinguished, Detectives Paul Makuc and Wayne Opdenbrouw of the State Police Fire and Explosion Investigation Unit arrived at the scene with their canine partners, Baxter and Elway. Makuc interviewed several eyewitnesses at the scene, but nobody saw who had started the fire. One neighbor, however, took several photographs of the front of the house as the fire progressed and provided them to the investigators.

Once the fire was extinguished, Opdenbrouw and Makuc conducted a fire cause and origin investigation. The investigators explored the exterior and interior of the house and observed that the fire damage was heaviest on the second floor. While conducting a walkthrough of Apartment 2A, the investigators noted that it was sparsely furnished and appeared to have been vacant at the time of the fire. They observed smoke and heat damage in the bedroom and, as they walked toward the rear of the apartment and into the kitchen, the smoke and heat damage increased and fire damage became more apparent. The fire damage indicated that the kitchen and the living room were engulfed in flames.

On the basis of their walk-through, their review of witness statements and photographs, and their discussions with firefighters, the investigators made a preliminary determination that the fire began in Apartment 2A.

Opdenbrouw and Makuc then conducted a "layered examination" of the fire debris within Apartment 2A.[12] In the kitchen, investigators noted that the burn patterns were low to the floor and had a "V" pattern. Additionally, in the southwest corner of the kitchen between the refrigerator and the doorway to the living room, they observed that "[t]he baseboard trim . . . [was] very, very heavily fire damaged" and that there were irregular burn patterns on the floor. All of this they found to be indicative of an intentionally set fire.

When the investigators were unable to locate a "competent ignition [source]" within the apartment, e.g., electrical appliances, space heaters, or candles, they brought Baxter, a trained and certified accelerant detection canine, to the apartment. Baxter alerted to the possible presence of an accelerant in the southwest corner of the kitchen and by an unburnt section of the carpet in the middle of the living room, which had been covered by a collapsed coffee table. Samples were taken from the two areas where Baxter alerted and provided to Dr. Jack Hubball, the head of the chemistry section of the state forensic laboratory. Hubball concluded that only the kitchen sample contained the presence of a flammable liquid, specifically, a "medium boiling range petroleum distillate,"[13] and that the living room sample contained "medium boiling range organic compounds," which "have nothing to do with a flammable liquid. They're simply junk that occurs in the course of a fire . . . ." Hubball explained at trial that it was not unusual for a canine trained in accelerant detection to alert to the type of organic compound found in the living room because that compound has a "close relationship" with the compounds found in some accelerants.[14]

At trial, Opdenbrouw and Makuc testified that, on the basis of the totality of their investigation, the fire had been intentionally set by human hand with an open flame. Although neither investigator testified as to the precise area the fire originated, Makuc's diagram of Apartment 2A, which was entered into evidence, indicated that the "area of origin" was in the doorway between the kitchen and the living room. Opdenbrouw explained that this designation indicated only the general area of origin, as "to put precisely the point of origin where an individual took an open flame and set it down to the floor is nearly impossible."[15] In contrast, Wallace testified that the defendant told her that "he put his hand through the second floor window and set the curtains on fire."

During closing argument, defense counsel attacked Wallace's credibility and the quality of the fire investigation. Defense counsel argued that Wallace's testimony

was not credible because the physical evidence contradicted it. In particular, defense counsel focused on the fact that there were no windows or curtains near the location that Opdenbrouw and Makuc identified as the area of origin.[16] Additionally, he argued that Wallace's assertion that the defendant had told her that the flames "looked like daylight, it was so bright," was contradicted by Wommack's testimony that he called the fire department because he saw black smoke and by the photographs of the progression of the fire, which showed that it was not very bright in the early stages.

Defense counsel also argued that the investigators' conclusion that the fire started near the kitchen corner where Baxter had alerted was unreliable and characteristic of a conclusory investigation. Defense counsel focused on the fact that there was evidence that water was pooling in the kitchen corner where Baxter had alerted and that, because there was evidence that gasoline floats on water, any accelerant in the apartment could have been pulled into that corner when investigators punctured the floor to drain water from the apartment.[17]

In response to defense counsel's arguments, the prosecutor made the following remarks, the challenged portions of which are emphasized: "Now, here's the part of the argument where common sense comes into play: the issue of lighting the fire with the curtains. *I don't know specifically where that fire started.* Nobody could say specifically where that fire started. What we do know from the evidence is, the fire did not start in that photograph where—where the curtains were shown. That's on the left hand side of the building. Do you recall as you look up in that one picture . . . . on the left hand side of the building, there's a photograph that has the ladder, and it shows that curtain. And I believe the defense made a comment about that curtain.

"State's [exhibit] 16.[18] And the defense touched on [those] curtains, but if you look at the room itself, that's not where the fire started. So, the fact that curtains are still there in and of itself is not significant. The allegation is that *the fire started in the back room where the deck is.*

"Now, I'm going to correlate this to what Laura Wallace said. Laura Wallace says the fire starts at Apartment 2A, which, in fact, is where the fire started. That's on the second floor. It's not on the first floor of the building. It's on the second floor. So, that's exactly where the fire started. There's no curtains there. I don't know if there were curtains there because the fire was pretty intense in there, if you recall. . . .

"There's no testimony on [how or where the defendant broke into Apartment 2A]. But be that as it may, *I don't know where the fire exactly started.* And if you recall what the defense says—it was a hard fought.

Well, on the diagram where they show the area of origin, questions were asked—is that exactly where it starts? *And do you recall they said, well, we don't know.* It's this area, we believe, but *we don't know exactly.* But, essentially, it started on the second floor, and they believe it started back in the kitchen.

"Now, hold that for a second. Laura Wallace says that the defendant reaches in and lights it and there's a flame as bright as day. That's corroborated by Wommack. Wommack says he looks out and he sees the flames reflecting off the back of the building, and that's part of the reason why, along with the smoke, he called the fire department. Do you recall that? So, we know there's enough flames there, on the back of the building.

"But what else do we also know? We also know there's not enough flames from the front. The photographs that were taken by the neighbor that showed the flames coming up, and then there's a progression of the flames to show it going to the right hand side, is used to show that the fire did not start in Apartment 2B. Bright as day. Common sense.

"[The] state [is] making the inference and is alleging that the defendant took an accelerant, which was found, sprayed it into the apartment in some way in some place; lit it on fire. Common sense. What happens when you start a charcoal fire or any fire with charcoal lighter, and you light it? Phlough. There's a big flame if you use a lot of it. There's a big blast, and there's a lot of light and a lot of heat and a lot of flame. And then what does it do when you start a fire? It dies down and the other thing starts to catch fire, and the fire develops.

"So, his statement to *Ms. Wallace is consistent with using—him using an accelerant—an accelerant on the area.* . . .

"Really, what does the question come down to? The question comes down to who started the fire. That's what the question comes down to. Was an accelerant used? Well, an accelerant was found. The defendant—I believe the defense is arguing some nefarious intent by the police during the investigation, and moving things, and incompetent police, and one of the key points of his issue is that the accelerant was washed down to a corner of the apartment. He makes a lot out of that. And in fact, the testimony by the investigators [is] that water pooled down to that area.

"And what do we know? We know that the police dog alerted in there; the water pooled down there. *And then the police dog went back and alerted back toward where the curtains were.* That's logical that when they're putting water off on a fire, it would wash all the accelerants wherever they are, in the area of the window, down to the corner. It's logical. We ask you to use your common sense. Your common sense comes into play in evaluating all the evidence on this charge."

(Emphasis added; footnote added.)

After the prosecutor completed his rebuttal argument, defense counsel objected to the prosecutor's remark that "that the police dog alerted to where the curtains were" because that remark did not comport with the facts in evidence. Defense counsel requested that the court instruct the jury to disregard that remark. After reviewing that portion of the prosecutor's remarks and hearing argument from the parties, the court overruled the defendant's objection and declined to provide a curative instruction. The court stated that its "charge in general explains to the jury that it's their recollection of the fact that controls—of the facts that controls, and that if the attorney—what the attorneys say is different from their recollection, it's their recollection of the facts that controls, so, I think, under the circumstances, and since I do not believe there was any intentional misrepresentation of evidence in the case, I'm just going to leave it at the court's regular charge."

On appeal, the defendant raises five challenges to the prosecutor's rebuttal argument. We will address each of the claimed improprieties in turn.[19] We begin, however, with the standard of review and legal principles that guide our analysis of each of these claims. We review claims of prosecutorial impropriety under a two step analytical process. "The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). "The defendant bears the burden of satisfying both of these analytical steps." *State* v. *O'Brien-Veader*, 318 Conn. 514, 524, 122 A.3d 555 (2015).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . [B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Elias V.*, 168 Conn. App. 321, 347, 147 A.3d 1102, cert. denied, 323 Conn. 938, 151 A.3d 386 (2016).

A

The defendant first claims that the prosecutor improperly and "repeatedly stated that the police did not know exactly where the fire started, despite the unwavering testimony of Detectives Opdenbrouw and Makuc that the area of origin was the southwest corner of the kitchen floor." Similarly, the defendant claims that the prosecutor improperly expressed a personal opinion when he stated that he did not know where the fire started. We disagree with these two claims.

After reviewing the prosecutor's closing argument, we have found one instance when the prosecutor stated that the investigators did not know where the fire started and two instances when the prosecutor referred to his own knowledge. The prosecutor remarked: "*I don't know specifically where that fire started.* Nobody could say specifically where that fire started. What we do know from the evidence is, the fire did not start in that photograph where—where the curtains were shown." (Emphasis added.) Shortly thereafter, the prosecutor remarked: "*I don't know where the fire exactly started.* And if you recall what the defense says—it was a hard fought. Well, on the diagram where they show the area of origin, questions were asked—is that exactly where it starts? And do you recall *they said, well, we don't know*. It's this area, we believe, but *we don't know exactly*. But, essentially, it started on the second floor, and they believe it started back in the kitchen." (Emphasis added.)

It is well settled that "[c]ounsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them"; (emphasis omitted; internal quotation marks omitted) *State* v. *Arline*, 223 Conn. 52, 58, 612 A.2d 755 (1992); and we conclude that the challenged remarks were permissible comments on the evidence presented at trial. Although Makuc identified certain factors in the kitchen that led him to believe that the fire was intentionally set, he never testified as to the area of origin. Opdenbrouw did discuss the area of origin, but he consistently maintained that they could determine only the "general area of origin" of the fire, which he identified as the area near the doorway between the kitchen and the living room. Opdenbrouw further explained that "to put precisely the point of origin where an individual took an open flame and set it down to the floor is nearly impossible."

We further conclude that the prosecutor's remarks about his own knowledge did not constitute an improper personal opinion. Although there are restrictions on a prosecutor's ability to express a personal opinion during closing argument, "[i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw

inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, supra, 318 Conn. 547.

B

The defendant next claims that the prosecutor improperly stated "that the fire started in 'the back room where the deck is:' the living room" because the evidence adduced at trial showed that the fire started in the kitchen. We disagree.

The prosecutor's entire remark was that "[t]he allegation is that the fire started in the back room where the deck is." We observe that the prosecutor's rebuttal argument in this case often moved between points in a loose and nonlinear fashion. When evaluating this remark in the context of the prosecutor's entire argument, it is unclear whether the prosecutor, in making this statement, was definitively asserting that the state's theory of the case was that the fire started in the living room. Shortly before and after making this remark, the prosecutor stated that he did not know "specifically" or "exactly" where the fire started. Similarly, shortly after making this remark, the prosecutor observed that, despite his uncertainty as to the precise area of origin, the investigators' testimony and diagram indicated that "essentially, [the fire] started on the second floor . . . back in the kitchen." Later, the prosecutor again framed the state's allegation broadly: the "state [is] making the inference and is alleging that the defendant took an accelerant, which was found, sprayed it into the apartment in some way in some place; lit it on fire."

Nonetheless, even if we were to interpret the prosecutor's remark as asserting that the state's theory of the case was that the fire started in the living room, we cannot conclude that it constituted a misrepresentation of the evidence presented at trial. We disagree with the defendant that there was "no evidence that the fire started in the living room." As we previously explained, Opdenbrouw consistently refused to identify a precise area of origin. Instead, he identified the general area of origin as being in the doorway between the kitchen and the living room. Furthermore, the defendant himself suggested at trial that Baxter's alert in the kitchen corner was unreliable because the flow of water could have pulled the accelerant from another location in the apartment to that corner. Therefore, the evidence presented at trial could support an allegation that the fire started in the "back room where the deck is."

"As a general rule, we do not dissect every sentence of the prosecutor's argument to discover impropriety. . . . We do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial. . . . It

is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Citation omitted; internal quotation marks omitted.) *State* v. *Orellana*, 89 Conn. App. 71, 106, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). We cannot conclude that this remark rose to the level of prosecutorial impropriety.

C

The defendant's third claim is that "the prosecutor improperly suggested that the jury make an inference from facts not in evidence when he stated that Wallace's testimony about the cause of the fire was consistent with [him] using an accelerant." In particular, the defendant argues that it was improper for the prosecutor to suggest that it was reasonable to infer that "Wallace's testimony was consistent with [him] spraying accelerant through the living room window" because Wallace did not testify that he told her that he used an accelerant and because no accelerant was found in the living room.

The defendant's claim is without merit because it mischaracterizes the prosecutor's remark. The prosecutor neither stated nor suggested that Wallace's testimony was consistent with the defendant spraying accelerant through the living room window. Instead, the prosecutor argued that Wallace's testimony that the defendant told her that the flames "looked like daylight, it was so bright," is consistent with the defendant's "using . . . an accelerant on the area." Although the prosecutor's reference to "the area" is ambiguous, the prosecutor's statements immediately before and immediately after this remark do not suggest that the "area" he was referring to was the living room.[20]

Furthermore, the evidence presented at trial supported the prosecutor's remark. Opdenbrouw and Makuc testified that the burn patterns in Apartment 2A were consistent with an accelerant having been poured on the floor. Baxter alerted to the presence of accelerant in the kitchen. Hubball confirmed that the sample taken from the kitchen contained the presence of a flammable liquid. It is well established that "[a] prosecutor . . . is permitted to comment upon the evidence presented at trial and to argue the inferences that the [fact finder] might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Nelson*, 105 Conn. App. 393, 418, 937 A.2d 1249, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008). As a result, we cannot conclude that the disputed remark was improper.

D

The defendant's final claim is that "the prosecutor misstated the evidence about the areas where the police canine alerted" when he remarked that "the police dog went back and alerted back toward where the curtains were." The defendant argues that, "[a]s a result of this

impropriety, the jury would have been entitled to conclude that [Baxter's] alert by the living room window was consistent with Wallace's testimony that [he] reached into the window and lit the curtains on fire." We disagree.

As we previously explained, defense counsel argued at trial that Baxter's alert in the kitchen was unreliable because the accelerant could have been pulled toward the kitchen corner by the flow of water. When responding to this floating accelerant theory, the prosecutor remarked: "He makes a lot out of that. And, in fact, the testimony by the investigators [is] that water pooled down to that area. And what do we know? We know that the police dog alerted in there, the water pooled down there. *And then the police dog went back and alerted back toward where the curtains were.* That's logical that when they're putting water off on a fire, it would wash all the accelerants wherever they are, in the area of the window, down to the corner. It's logical." (Emphasis added.)

As the defendant correctly points out, the evidence demonstrated that Baxter alerted only in the kitchen corner and the living room. There was no evidence of curtains in these rooms. Although the defendant has identified a factual flaw in the prosecutor's argument, we disagree that it constituted prosecutorial impropriety.

There is a "distinction between misstatement and misconduct." *State* v. *Dawes*, 122 Conn. App. 303, 314, 999 A.3d 794, cert. denied, 298 Conn. 912, 4 A.3d 834 (2010); see also *State* v. *Orellana*, supra, 89 Conn. App. 105 (isolated misstatement not prosecutorial impropriety). The prosecutor correctly observed earlier in his argument that the only room with evidence of curtains was the bedroom and that the evidence was clear that the fire did not start in there. Additionally, before making the challenged remark, the prosecutor referred the jury to Makuc's diagram, which identified the area of origin as being in the doorway between the kitchen and the living room, and stated that the investigators had concluded that the fire had "started back in the kitchen." We reiterate that "[w]e do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Orellana*, supra, 106. Given the context of the challenged statement, it is clear that the prosecutor's reference to Baxter's alert near curtains was merely an isolated misstatement of the evidence, one that the jury likely recognized as such.[21]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The parties and witnesses at trial frequently referred to the house as

being "Wickham's house" even though Wickham does not appear to have had a proprietary interest in it. For simplicity, therefore, we refer to the house as Wickham's house.

[3] There was also evidence presented that the argument involved a dispute over crack cocaine.

[4] Two firefighters were injured while extinguishing the fire.

[5] Evidence was presented that from the location where the defendant called Fidrych, he would not have been able to see the fire.

[6] The officers interviewed Fidrych and Bogue. Fidrych confirmed that she saw the defendant on the night of the fire, that he called her, and that he told her that Wickham's house was on fire. Evidence was not presented as to what specifically Bogue said, but one of the investigating officers testified that Bogue's statements about the defendant concerned him, and the officer agreed with the prosecutor that Bogue's statements failed to "[dispel] [the] idea that [the defendant] was involved in this incident . . . ."

[7] As we discuss subsequently in this opinion, the court's factual findings were made during an oral ruling. The defendant has not provided this court with a signed transcript of that ruling. Instead, he has provided us with an unsigned transcript of the court's oral ruling. In an appeal challenging a ruling on a motion to suppress, an adequate record usually includes either a written memorandum of decision or a signed transcript of the court's oral ruling. Practice Book § 64-1 (a) (4). The appellant is responsible for providing that record to this court. Practice Book § 61-10 (a). "On occasion, we will entertain appellate review of an unsigned transcript when it sufficiently states the court's findings and conclusions." (Internal quotation marks omitted.) *State* v. *Oliphant*, 115 Conn. App. 542, 544, 973 A.2d 147, cert. denied, 293 Conn. 912, 978 A.2d 1113 (2009). We have reviewed the unsigned transcript in this case, and we conclude that it provides an adequate record for our review.

[8] Camp could not recall whether he told the defendant that he was free to leave at the clinic, but he recalled advising him that he was free to leave "a couple times" during their conversation at the cemetery.

[9] Camp's cell phone records confirmed that this call was made.

[10] The defendant suggests that he was further isolated from his mother by the fact that he "did not have a cell phone and was unable to contact her" after he missed their appointment. The force of this argument is diminished by the defendant's testimony at the suppression hearing that the clinic had a phone that patients were allowed to use and that he did in fact use the clinic phone to call his mother after the interview. The defendant disavowed ever being offered the use of one of the police officers' cell phones, which he thought seemed "strange . . . ." The defendant stated that his mother arrived "pretty quick" after he called her from the clinic, "maybe fifteen, twenty" minutes.

[11] The defendant argues that the court failed to consider that he had to ask the police officers twice to leave before he was permitted to leave, once at the clinic and once at the cemetery. The record does not support the defendant's argument. At the suppression hearing, Camp testified that he believed that the defendant mentioned having an appointment with his mother before they went to the cemetery. Camp did not testify, however, that the defendant told them at the clinic when his appointment with his mother was or that he could not speak to them because his mother would be there shortly. Additionally, although the defendant testified that he told the officers at one point that he had to meet his mother, he did not testify that he told the officers while they were at the clinic that he could not speak with them because his mother would be there shortly. Indeed, the only time the defendant mentioned telling the officers about his meeting with his mother was when he told them in the cemetery that he needed to leave because he was concerned about being late to meet his mother. The defendant further testified that after making this request, he was allowed to leave.

[12] Opdenbrouw explained: "Layering . . . is basically—it's almost like being an archeologist in that . . . you've got to get down to where the room condition was at the time of the fire. If this room were to have a fire within it, fire suppression crews are going to come and firefighters are going to come in. They're going to spray water everywhere; they're going to knock things over, clearly, in an effort to put out the fire. They're also going to overhaul or pull ceilings and pull walls to try to find trapped fire. When they do that, you end up with all of this debris falling onto your floor, and the floor that you look at when you walk in for a fire investigation is not necessarily the floor that would have been there at the time the fire occurred.

"Many times what we have to do as fire investigators is layer out that material to get lower to the room as it was at the actual time of fire, and that's how we usually locate competent ignition sources, evidentiary items, patterns, and such."

[13] Hubball explained that "the category of medium boiling range petroleum distillates . . . is the largest class of commercially available products. All of your paint thinners, charcoal lighter fluids, oil based paint, oil based stains, car care products, industrial solvents—all of these materials are considered to be medium boiling range petroleum distillates."

[14] Hubball is also the laboratory's liaison to the state's canine units and is responsible for certifying all of the canines trained in accelerant, bomb, and drug detection in Connecticut.

[15] Although Makuc was questioned while being shown the diagram, he was never asked whether the designated area of origin was intended to be a general or a precise designation.

[16] The area of origin in Makuc's diagram is in the northwest region of the living room near to the doorway to the kitchen. Conversely, the window near the porch was located in the southeast region of the living room. Although there was evidence of curtains in the bedroom, there was no evidence that the living room window had curtains prior to the fire.

[17] No evidence was presented that the floor was punctured to drain water from the apartment. During cross-examination, defense counsel asked Opdenbrouw whether the floor was punctured to drain water from Apartment 2A, but he did not recall whether the floor was punctured. Defense counsel asked Makuc whether the fire investigators had to drain the standing water in Apartment 2A, and he agreed that the water was either drained or dried up. He did not testify, however, as to how the water was drained.

[18] Exhibit 16 is a photograph of the Apartment 2A bedroom, which is located at the front of the apartment. In the corner of that photograph, there is a window with what appears to be a curtain or blanket hanging from it.

[19] Although the defendant did not object to all of the improprieties claimed on appeal, they are nevertheless reviewable. "We previously have recognized that a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Gibson*, 302 Conn. 653, 658–59, 31 A.3d 346 (2011).

[20] Rather, shortly before making this remark the prosecutor stated that the investigators concluded that "essentially, it started on the second floor, and they believe it started back in the kitchen." The prosecutor also explained a few sentences before the disputed remark that he was "making the inference and . . . alleging that the defendant took an accelerant, which was found, sprayed it into the apartment in some way in some place . . . ."

[21] We also observe that, contrary to the defendant's assertion, the prosecutor's closing argument would not have "entitled [the jury] to conclude that [Baxter's] alert by the living room window was consistent with Wallace's testimony that [he] reached into the window and lit the curtains on fire." It is well settled that "[s]tatements or comments made by attorneys in the course of examination or argument are not facts in evidence, and may not properly be considered by the jury." *State* v. *Duntz*, 223 Conn. 207, 236, 613 A.2d 224 (1992). In accordance with this principle, the jury was instructed that the arguments and statements made by the attorneys were not evidence and could not be considered when deciding the facts of the case.